[No. 13524.  Department Two.  February 24, 1917.]

## A. G. RUGGER, *Respondent*, v. A. W. HAMMOND, as *Receiver etc.*, *Appellant*.[1]

BANKS AND BANKING — INSOLVENCY — TRUST FUND — FOLLOWING TRUST—BURDEN OF PROOF—EVIDENCE—SUFFICIENCY. In an action to recover from the receiver of an insolvent bank money collected by it and held in trust for the plaintiff, it is not enough to prove the trust relation and that the money physically became a part of the bank assets; but the burden is upon plaintiff to clearly and satisfactorily show that his money in its original or substituted form is in the hands of the receiver; and this is not done where it appears that, when it collected the money nine months before insolvency, the bank repudiated the trust and wrongfully credited the money to another, to whom it paid part of it, and presumably used the balance indiscriminately with other assets during that time.

APPEAL—REVIEW—FINDINGS—EXCEPTIONS—QUESTION FOR JURY. In order to secure a review on appeal, exceptions to findings of fact as required by Rem. Code, § 383, may be filed on the 5th day following the signing of the findings.

BANKS AND BANKING—INSOLVENCY—CLAIMS—INTEREST. A general creditor of an insolvent bank on account of money collected and held in trust is entitled to interest on the amount due from the date of demand made therefor.

APPEAL—COSTS ON APPEAL. Appellant, successful upon the whole controversy in the supreme court as to a preference right, is entitled to costs on appeal.

Appeal from a judgment of the superior court for Pacific county, Rice, J., entered February 3, 1916, in favor of the plaintiff, upon an agreed statement of facts, in an action to recover a trust fund. Reversed.

*Lockerby & Couden*, for appellant.

*Robert G. Chambers* and *W. H. Abel*, for respondent.

PARKER, J.—This action was originally commenced in the superior court for Pacific county by the plaintiff, Rugger, against the Raymond Trust Company, a banking corpora-

[1]Reported in 163 Pac. 408.

tion, to recover the sum of $3,551.59, which he claims had
been received by that company for him as the proceeds of
the sale of certain local improvement bonds belonging to him.
Thereafter the Raymond Trust Company became insolvent,
when its property and affairs passed into the hands of the
defendant, Hammond, as receiver for the benefit of its cred-
itors, and thereafter the case proceeded to trial as against
the receiver upon an agreed statement of facts in accordance
with which the pleadings were deemed by all parties con-
cerned to be amended. The controversy as thus presented
to the superior court and as here presented has to do with
the claimed right of Rugger to have returned to him from
the assets of the trust company in the hands of the receiver
an amount equal to his claim in preference to the rights of
the general creditors of the trust company. In other words,
whether the moneys of Rugger so received by the trust com-
pany constitute a 'trust fund traceable into the assets of the
trust company now in the hands of the receiver. The trial
in the superior court resulted in judgment and decree in
favor of Rugger, establishing his preference right to have
returned to him from the assets of the trust company in
the hands of the receiver an amount equal to the money so
received by it, less the sum of $696.80 received by him which
the trial court decided was chargeable as an offset against
his claim. From this judgment and decree, the receiver has
appealed to this court.

The detail facts are not in dispute, though there is serious
controversy as to inferences to be drawn therefrom. They
are all stipulated, except as to one or two minor matters
appearing uncontradicted in the deposition of one witness,
and may be summarized as follows: Early in the year 1913,
one A. H. Steeples entered into a contract with the city of
Raymond for the construction of two local improvements,
for which there became payable to him in local improvement
bonds the sum of $6,800. On February 6, 1913, Steeples
being indebted to Rugger in the sum of $3,399.14, evidenced

by promissory notes, duly assigned in writing to him $3,551.59 of the local improvement bonds, the proceeds of the sale of which were to be applied on that indebtedness. On the same day, Rugger and Steeples agreed that all of the local improvement bonds should be sold to certain purchasers in Seattle and Tacoma when issued, evidently with the understanding that the bonds should be forwarded to the purchasers through the Raymond Trust Company and that it should collect the proceeds thereof for them. In August, 1913, Rugger, being about to depart for California on a visit, deposited this assignment with the Raymond Trust Company, with instructions to apply the proceeds of the sale of the bonds when received by it to the payment of the debt owing by Steeples to him, and credit his account with the amount so collected, the notes evidencing such debt apparently also being in the hands of the trust company at that time for collection. This the trust company agreed to do. While the face value of the bonds assigned by Steeples to Rugger was somewhat in excess of the principal of the debt to the payment of which their proceeds were to be applied, it is a fair interpretation of the stipulated facts that Rugger was to have the full sum of $3,551.59 in payment of the debt. This may be accounted for by the fact that interest would accrue upon the debt before the issuance and sale of the bonds.

In December, 1913, the bonds were duly issued by the city and, in pursuance of the understanding existing between all parties concerned, were delivered to the trust company to the end that they be forwarded to the purchasers at Seattle and Tacoma and the proceeds collected by the trust company for Rugger and Steeples. Shortly thereafter in due course, in December, 1913, the proceeds were received by the trust company. Instead of applying $3,551.59 of the proceeds of the sale to the payment of the notes evidencing the debt due to Rugger from Steeples, in pursuance of the understanding had between the trust company and Rugger,

it credited upon its books the whole of the proceeds, being $6,498, to Steeples' deposit account. It immediately thereafter applied $1,654 thereof, evidently by Steeples' consent, towards the payment of a $4,100 debt then owing by him to the trust company, $2,500 of which debt was secured by mortgage upon a contracting outfit, and also paid to Steeples therefrom $500 in cash, leaving $4,344 standing to the credit of Steeples upon his deposit account. As to what was further done with this balance, either by Steeples or the trust company, we are not informed by this record, except as it would seem to follow as a matter of course that the money was used by the trust company in the usual course of its banking business.

On March 23, 1914, Rugger having returned from California, demanded of the trust company $3,551.59, the amount of his portion of the proceeds of the sale of the bonds which had been received by it for him. This demand the trust company refused to comply with. On March 30, 1914, the debt owing from Steeples to Rugger remaining wholly unpaid, because of the failure of the trust company to apply the proceeds of the sale of the bonds thereon as agreed, Steeples gave to Rugger a mortgage upon certain property to further secure that debt. The trial court concluded, from the detailed statement of account of this property contained in the agreed statement of fact, that thereafter Rugger received as the proceeds thereof the sum of $696.80. In July, 1914, this action was commenced by Rugger against the trust company. On September 23, 1914, the trust company was adjudged insolvent, when its affairs and property passed into the hands of appellant as receiver for the benefit of its creditors. Thereafter, the case was tried, resulting in judgment and decree awarding to Rugger, as a preferred claim against all the assets in the hands of appellant as receiver, the sum of $2,854.79, being $696.80 less than the total amount claimed. At the time the Raymond Trust Company became insolvent and

passed into the hands of appellant as receiver, it then had
on hand the sum of $2,830.60 in cash, and no more, which
passed into his hands with its other assets.

No serious contention is here made but that, when the trust
company received the proceeds of the sale of Rugger's inter-
est in the local improvement bonds, it became a trustee of
the money so received, and accountable to him therefor as
such. Nor is it here contended but that Rugger's rights
as against the receiver of the trust company are at least
equal to those of a general creditor, entitling him to share
as such in the proceeds of the assets in the hands of the
receiver. Let us be reminded that this is not now a con-
troversy between Rugger and the trust company wherein
the question of the trust relation between them would be
little else than academic, since then, of course, he could
subject all of the trust company's property to the satisfac-
tion of his claim, which he could also do if there existed only
the relation of debtor and creditor between them. Care
must be exercised to the end that we be not led astray by
the thought that the receiver stands in the shoes of the trust
company and has only the rights enjoyed by, and is subject
to all the obligations of, the trust company. Speaking gen-
erally, it is true that this thought has much to do with the
determining of the rights of claimants of funds or property
in the hands of parties who are successors in interest of
trustees of such claimants, but it is far from being of con-
trolling influence when the question is whether or not the
property so claimed is the same property, in fact or in law,
as that which was received and held in trust for the claimant
by his trustee.

Now, in so far as we are concerned with the trust theory,
upon which Rugger seeks recovery here, we are confronted
with a question of title and not a question of debt. Mani-
festly, in so far as Rugger seeks recovery upon that theory,
this is nothing more nor less than an action to recover prop-
erty, and the fact that he seeks recovery of his property in a

changed or substituted form, such as in the eyes of the law might make it still his property, does not in the least change the nature of the ground of recovery which he here invokes. Such change of form in the property has to do only with the description and identity thereof. As said by Justice Peckham, speaking for the New York court of appeals in *Holmes v. Gilman*, 138 N. Y. 369, 34 N. E. 205, 34 Am. St. 463, 20 L. R. A. 566:

"The right has its basis in the right of property, and the court proceeds on the principle that the title has not been affected by the change made of the trust funds, and the *cestui que trust* has his option to claim the property and its increased value as representing his original fund. The right to follow and appropriate ceases only when the means of ascertainment fail. It is a question of title."

And as even more tersely stated by Chief Justice Alvey, speaking for the court of appeals of Maryland in *Englar v. Offutt*, 70 Md. 78, 16 Atl. 497, 14 Am. St. 332:

"The true owner of a fund traced to the possession of another has a right to have it restored, not as a debt due and owing, but because it is his property wrongfully withheld from him."

Justice Shelby, speaking for the fifth Federal circuit court of appeals in *Butler v. Western German Bank*, 159 Fed. 116, recognized this underlying principle in observing that:

"The equity, springing as it does from the right to trace the funds or property, does not extend to a right to take other funds or property by way of damages or interest."

In 1 Bolles, Modern Law of Banking, p. 190, that learned author pointedly reminds us of that which becomes apparent to anyone upon an examination of the numerous decisions touching this question that:

"Many a beneficiary has been unable to recover, not through his failure to prove the existence of a trust, but of a fund that he could rightfully claim as his own."

These observations, it may be thought, are unnecessary here because of their elementary character and the well understood theory of a claimant's right of recovery of the nature here sought by Rugger. We deem it appropriate, however, to emphasize this principle to the end that the ingenious argument of counsel may not lead us astray in the determination of the real question here involved, which, in its final analysis, is little else than a question of fact, though the case is submitted to us upon detail facts which are not in dispute. That is, the question of whether or not there came into the hands of the receiver Rugger's money or its substitute.

Let us also be reminded of another elementary proposition of law, to wit, that the mere fact that at some time the trust company may have had in its possession $3,551.59 of Rugger's money in trust for him, does not entitle him to recover a like amount from the receiver in preference to the general creditors' rights, but he must also show to a reasonable degree of certainty, by direct proof or by clear inference to be drawn therefrom, that his money or its substitute has passed into the hands of the receiver, remembering that it is property and not a debt that he is seeking to recover, in so far as his claimed preference is concerned. A clear statement of this principle is made by Justice Deemer, speaking for the supreme court of Iowa, in *Bradley v. Chesebrough*, 111 Iowa 126, 82 N. W. 472, as follows:

"That plaintiff was a trust creditor does not of itself, entitle him to preference over general creditors. To obtain that right he must show, by presumption of law or otherwise, that his fund has been preserved in the hands of the assignee, as an increase of the assets of the estate, from which it may be taken without impairment of the rights of general creditors."

Whatever seeming want of harmony there may be in the decisions of the courts in cases of this nature, we think it safe to say that they all recognize this to be the law. Indeed,

the law could not be otherwise, in view of the fact that it is property and not a debt which is sought to be recovered. Even those decisions which, as some authorities view them, have gone to the extreme in allowing preferred claims in such cases, were all rendered, as we read them, upon the theory that the proof in the particular case called for the inference that the fund or property sought to be recovered had actually passed, in original or substituted form, into the hands of the successor of the trustee, and could be restored to its owner without impairing the assets to which general creditors had a right to look for the payment of their claims.

We have seen that, when the trust company received for Rugger the $3,551.59, his portion of the proceeds of the sale of the local improvement bonds, it became a trustee therefor and subject to account to him as such; that it then appropriated that money to a use which resulted in wholly depriving him thereof; that it then, in effect, repudiated its trust obligation to him by crediting the whole of the money to the deposit account of Steeples; that from this deposit credit of Steeples it appropriated $1,654 to pay upon the $4,100 then owing by Steeples to it, and paid to Steeples $500 in cash, leaving a balance to his credit of $4,344. We may assume, for argument's sake, that in so far as the trust company's books show this credit of Steeples, it so remained until the passing of its affairs and property into the hands of the receiver. In this way only can it be said that Rugger's money went into and became a part of the assets of the trust company. Now this occurred nine months before the trust company was adjudged insolvent and its remaining property passed into the hands of the receiver. What became of this particular money in the meantime and whether or not it passed to the receiver in any form is wholly a matter of conjecture, viewing the problem as a naked question of fact apart from the inference which counsel for Rugger insists the law furnishes as show-

ing that it in some form went into the hands of the receiver.
It might be well argued that, since the trust company did
not in the first instance appropriate the money directly to
its own use but to the use of Steeples, who is not a party to
this action, by crediting it to his deposit account, the money
did not,. in any event, pass into the trust company's assets
as Rugger's money any more than as if it had passed entirely
out of the trust company's hands and came back to it in the
usual course of business, in which case it. would seem, as a
matter of course, to lose its identity as Rugger's money,
assuming that it had followed such a course without collu-
sion on the part of those through whom it might have so
passed. We leave this question, however, and proceed upon
the assumption that the money originally thus went into and
became a part of the assets of the trust company by the
act of that company, but not assuming that the resources
of the trust company were thereby increased, or that the
money eventually passed in any form into the hands of the
receiver.

It seems to be the theory of counsel for Rugger, and it
is apparently the theory upon which the trial court rested
its allowance of his claim as a preferred one, that, since
Rugger's money thus went into the assets of the trust com-
pany, it must be inferred that the assets of that company
were not only then enhanced to that extent, but that the
money, at least in some substituted form, went into the hands
of the receiver nine months thereafter. When the trust
company applied $1,654 of Steeples' deposit credit, made up
partially of Rugger's money, towards the payment of
Steeples' debt owing to it and paid to him $500 in cash
therefrom, there was left to his credit $4,344, which, as we
have noticed, is more than the $3,551.59 the trust company
had received in trust for Rugger. Was this $1,654 and
$500, taken from Steeples' deposit credit, his money or Rug-
ger's money? The inference which counsel for Rugger in-
vokes, presently to be noticed, if at all applicable here, tells

us that it was Steeples' money, and that in no event could Rugger's money be then found among the assets of the trust company, unless it be found in the $4,344 remaining in the deposit credit of Steeples.    True, this money in a sense went into the assets of the trust company, but so does all money which is deposited in a bank, since title thereto passes to the bank.    It is not enough, however, for our present purpose that the money physically became a part of the trust company's assets, it must have actually swelled the net assets of the trust company and passed in some form to the hands of the receiver.    Manifestly the receiving of money on deposit by a bank does not ordinarily swell its assets, for it creates a debt of the bank equal to the amount so received. In order, therefore, for counsel to have any basis for their contentions in Rugger's behalf, it must be assumed, as they do, that the trust company was in the same position as if it had, upon the receipt of Rugger's $3,551.59, held it apart from Steeples' deposit account.    There is not a word in this record showing the actual use to which this money was put by the trust company during the nine months following the receipt of it by the trust company.    It evidently, however, was mingled with the moneys of the trust company and used in the usual course of its banking business.    We may assume, for argument's sake, that it was never paid out to Steeples. How much of it was preserved or lost with other assets during this nine months of approaching insolvency is wholly a matter of speculation.    If it was used indiscriminately with other moneys of the trust company, as we must presume it was, it must of necessity have suffered depreciation at least in the same measure as the other assets did.    As to how much this amounted to we are not informed.    But a banking institution going into insolvency with but $2,830.66 on hand strongly suggests a serious impairment of its assets as compared with its condition nine months previous.    Now in the light of these facts, what basis is there upon which to rest any inference

that Rugger's money, or any property constituting a substitution therefor, passed into the hands of the receiver? We confess our inability to conceive of any such result, except in the realm of speculation and conjecture. Passing for the moment the question of the $2,830.66 in cash received by the receiver being a part of Rugger's trust fund, and assuming that Rugger's money in some measure went towards the reduction of the debts of the trust company, we are still wholly in the dark as to the measure to be applied in determining the amount of Rugger's money or its substitute to be now found in the hands of the receiver. In *Jones v. Chesebrough*, 105 Iowa 303, 75 N. W. 97, Justice Granger, speaking for the court, answering the contention that the paying out of trust funds by a bank in the usual course of business, resulting in lessening its debts, so contributed to the remaining assets of the bank as to become a part thereof passing into the hands of its receiver upon insolvency, observed:

"While the payment of debts in that manner by a trust fund lessens the indebtedness of an insolvent estate, and may thereby increase the percentage of dividend to be declared from other funds, it does not follow that the assignee has any increase of assets because of it. It may follow that he has less debts to pay, and the estate is in that way benefited. But such a benefit to the creditors is but partial, and, if such a payment is to serve as a reason for withdrawing an equal amount from the assignee, the result is an absolute loss to the creditors. We do not think a preference should be sustained under such conditions. . . . When trust money has been received, it is not material whether it is preserved in the form of money or other property; but it must appear, by presumption of law or otherwise, that it has been preserved in the hands of the assignee, as an increase of assets in his hands, from which it may be taken without impairment of the rights of creditors."

In *Cherry v. Territory*, 17 Okl. 221, 89 Pac. 192, 8 L. R. A. (N. S.) 1254, the question of following trust funds

was learnedly reviewed at length by Justice Burwell. In the course of the opinion he said:

"In a case like the one at bar, a depositor is given a preference only upon the theory that his property having been received by the bank in fraud, and he having been deceived, the law gives back the identical property if it can be found; and, if it has been converted into some other property or money, that other property or money must stand in lieu of the property fraudulently received by the bank. The claimant must, however, trace the fund by evidence that is clear and satisfactory, where the rights of other creditors are affected."

It seems to us that, whatever the seeming conflict of authority may be, the courts are quite generally agreed that, in cases of this nature, the burden of proof is upon the claimant, and that it must clearly and satisfactorily appear that his money or property sought to be recovered is actually, in its original or substituted form, in the hands of the successor of his trustee. It is true such ultimate fact need not be positively proven in all cases by direct evidence, but the evidence must, in any event, by clear inference lead to the conclusion that the claimant's property is in the hands of the trustee's successor in some form. *Blake v. State Savings Bank*, 12 Wash. 619, 41 Pac. 909, is in harmony with this view though the exact question was not there involved. We are of the opinion that it is not shown by the facts of this case, either directly or inferentially, that Rugger's money which was received by the trust company in trust for him, or any property which can be considered as a substitute therefor, ever passed into the hands of the receiver, unless it be held that the $2,830.66 in cash which passed into his hands as a·part of the assets of the trust company is Rugger's money.

It is contended in Rugger's behalf that, in any event, he should be adjudged to have a preferred claim against the assets in the hands of the receiver equal to the amount of the $2,830.66 in cash passing into the hands of the receiver

at the time of the trust company's adjudged insolvency.
This contention is rested upon that inference which the law
raises in some cases of this nature that the trustee will be
presumed to have paid out his own money and not that of
his beneficiary.  When this presumption controls the case,
the recovery is limited to the lowest amount of money in the
hands of the trustee between the receiving of the trust fund
and the trustee's insolvency, and that not affirmatively ap-
pearing, some courts seem to assume that the amount of
money passing to the trustee's successor as assignee or re-
ceiver is the lowest amount at any time in the trustee's
hands, and deem such sum as having been at all times pre-
served for the beneficiary.  A critical examination of these
decisions, however, will show that, in all cases where this pre-
sumption was given such controlling force as to be decisive
in favor of the beneficiary, the trust was unrepudiated by
the trustee.  We are quite unable to understand how any
such presumption can be of controlling force where the
trustee has, at all times after the receipt of the trust fund,
·repudiated the trust.  Where the trustee openly ignored the
trust, manifestly it cannot be presumed that he will act so
as to preserve the trust fund for the beneficiary, but on the
contrary, will be presumed to have treated and handled it as
his own without reference to the rights of the beneficiary.
Our decision in *Carlson v. Kies*, 75 Wash. 171, 134 Pac. 808,
47 L. R. A. (N. S.) 317, was controlled by the presumption
that the insolvent bank had not paid out the trust fund but
had preserved it in cash, it having on hand at all times cash
largely in excess of the amount of the trust fund and never
having denied the existence of or repudiated the trust.  In 1
Bolles, Modern Law of Banking, pp. 192, 193, the presump-
tion here invoked by counsel for Rugger, in so far as his
claimed preference might be measured by the amount of cash
actually passing to the receiver of the trust company, is re-
viewed.  Among other things, that learned author observes:

"Legal presumptions have often served as valuable rules in deciding cases, but injustice may be done by an erroneous application of them. When the fact of a trust deposit is not questioned the rule is clearly settled that it can be recovered if it, or its substitute, can be traced into any other form, or remains a part of an existing fund. But another rule must also be kept in sight—a fund belonging to another depositor, or to him in common with trust depositors, cannot be diverted to pay exclusively one class to the manifest loss of the other. Nor must the presumption we have been considering be employed to accomplish this purpose. It is an artificial presumption and should never stand in the way of an inquiry into the facts. If they fail to show what use was made of a trust deposit, the courts should be slow to permit a recovery based solely on this presumption. When a trust deposit has been mingled with another fund and is truly there, it may be reclaimed by the trust depositor, but when its existence rests on a presumption that is probably opposed to fact, or at best on uncertainty respecting the retention or use of a trust deposit, a court may well hesitate to give precedence to the claims of a trust depositor on the slender basis of this presumption.

"Three classes of cases at least exist to which this presumption should be dissimilarly applied:

"(1) Those in which the bank has no knowledge that the deposit is a trust fund—for example, a deposit made by an agent against his principal's express or implied direction in his own name. Surely, in such a case, the bank would not reserve the deposits in making payments. . . .

"(2) In like manner a bank may receive a trust deposit knowing its true character, but, not regarding the law, mingles it with its general fund and pays it out without caring a whit about its legal obligations. Is not the application of the presumption in this class of cases without a reasonable basis?

"(3) A third class of cases may be mentioned to which the presumption may be properly applied, or in which the fact may be shown, that the bank did seek to preserve the trust deposit. . . .

"This presumption has been made to serve a twofold purpose—to preserve a fund for a trust depositor and to lessen the wrong-doing of the bank officers in the receipt and use

of it. The facts in many a case in which this presumption has been applied have shown that the officers were utterly indifferent to the law in the general conduct of their bank; is it not quite illogical, therefore, to maintain that in this particular matter they sought to regard the law in the interest of the true owner of the deposit? The only case in which the presumption ought to be applied is the one in which the bank knew, either at the time of receiving the deposit or afterwards while it was in its possession, its true trust character, and in the keeping and use of it sought to observe the law."

No decision has come to our attention which we regard, when critically read, as opposed to these views. We are of the opinion that the presumption here invoked by counsel for Rugger becomes of no force in the light of the undisputed facts in this record showing conclusively that the trust was repudiated by the trust company nine months before its assets passed to the hands of the receiver. We conclude that the $2,830.66 cash which came into the hands of the receiver is not shown to be either the money or proceeds of the money which was received in trust for Rugger by the trust company. Decisions have been rendered which may not support this conclusion, but we think it is in accord with the decided weight of authority.

Some contention is made in Rugger's behalf that the receiver is now bound by the finding made by the trial court to the effect that the assets of the trust company upon the receipt of the amount of the proceeds of the sale of the bonds belonging to Rugger became augmented in that sum. This finding can hardly be construed as meaning that the assets of the trust company coming into the hands of the receiver were so augmented, though we may, for the purpose of argument, so construe it. Counsel's contention that the receiver is bound by this finding is rested upon the assumption that it was not excepted to in time. The answer to this contention is found in the fact that the exceptions were duly made and filed as required by Rem. Code, § 383, on the 5th day

following the signing of the findings by the judge. In urging that these exceptions were not filed in time, counsel evidently has mistaken the date of the preparation and serving of the proposed findings for the date they were actually signed by the trial judge. Plainly the exceptions were made and filed within time. It seems quite clear, therefore, that the receiver is not bound by this finding.

Contention is made in behalf of the receiver that the court erred in finding, or rather concluding, that the proceeds of the property mortgaged as security for his debt due from Steeples was not properly accounted for, and that more than $696.80 should have been on that account deducted from Rugger's claim. The statement of account of that property and the proceeds thereof made in the agreed statement of facts we concede is not very satisfactory, but, from the details there given, we agree with the trial court that no more than that sum can in any event be properly charged to Rugger and be deducted from his claim as a general creditor of the trust company.

Some contention is made in the receiver's behalf against the allowance of interest at legal rate upon Rugger's claim from the date of his demand upon the trust company for payment of his $3,551.59, received by it for him as the proceeds of the sale of the bonds. Were we holding that the trial court was not in error in allowing Rugger's claim as a preferred claim, we would be inclined to hold that it was in error in allowing interest thereon, having in mind that, as a preferred claim, it is a claim of title and not for a debt. In view, however, of the fact that there is no contention made against Rugger's claim in so far as allowing it as that of a general creditor is concerned, we see no reason why he is not entitled to interest as allowed by the trial court, to be paid with the principal *pro rata* with other claims of general creditors.

We conclude that the judgment and decree of the trial court must be reversed, and in place thereof judgment en-

tered by the trial court allowing Rugger's claim in the sum of $3,551.59, less the sum of $696.80, to wit, in the sum of $2,854.79, with legal interest from March 23, 1914. It is so ordered, and the cause is remanded to the trial court with directions to enter its judgment accordingly.

Since the whole controversy in this court has been with reference to Rugger's right to recover his money as a trust fund, in other words, to recover his property, and the receiver has made no contention against his right to have his claim allowed as a general creditor, we conclude that appellant is entitled to recover his costs incurred in this court.

MOUNT, HOLCOMB, and MORRIS, JJ., concur.