[No. 16495.    Department Two.    August 4, 1921.]

DEM. SPIROPLOS, *Appellant,* v. SCANDINAVIAN-AMERICAN BANK OF TACOMA *et al., Respondents.*

KONSTANTINOS N. DIMOS, *Appellant,* v. SCANDINAVIAN-AMERICAN BANK OF TACOMA *et al., Respondents.*[1]

BANKS AND BANKING (26)—GENERAL OR SPECIAL DEPOSITS—PREFERRED CLAIMS. The purchase of a draft from a bank would not constitute the money or its equivalent paid therefor a special deposit, since the transaction merely creates the relation of debtor and creditor, unless it be shown that in some way the net cash assets of the bank are increased thereby; and such assets were not increased by the deposit, since it created a corresponding liability.

SAME (6)—INSOLVENCY—DEPOSITS AFTER INSOLVENCY—FRAUD. Where a draft by plaintiff from defendant bank on a Greek bank was handled by the drawing of two drafts by the local bank, one on the New York correspondent of the Greek bank, and one on its own New York correspondent, to meet the draft on the Greek bank, which its New York correspondent refused to accept and pay because of notice of the subsequent insolvency of the defendant bank, the transaction between plaintiff and defendant bank would not amount to a special deposit so as to constitute plaintiff's claim a preferred one; and it cannot be said that a fraud was worked on the depositor from the fact that the bank was insolvent on the day the deposit was received.

Appeal from judgments of the superior court for Pierce county, Card, J., entered April 16, 1920, in favor of the defendants, dismissing consolidated actions to establish claims against an insolvent bank, tried to the court.    Affirmed.

*Govnor Teats, Leo Teats,* and *Ralph Teats,* for appellants.

*Guy E. Kelly, Thomas MacMahon,* and *F. D. Oakley,* for respondents.

MAIN, J.—These two cases in the superior court were consolidated for the purpose of trial and are presented

[1]Reported in 199 Pac. 997.

here upon the record there made. The plaintiffs, by their actions, sought to establish and recover as preferred claims the sums which they had respectively paid for drafts issued by a bank which a few days later was closed by the bank commissioner and placed in the hands of a receiver. At the conclusion of the trial, the court dismissed the actions and the plaintiffs appealed.

The case of Dem. Spiroplos will be considered first, and the facts of that case essentially to be stated are these: On the eleventh day of January, 1921, Spiroplos, a Greek resident of Tacoma, went to various banks in that city for the purpose of ascertaining where he could get the best rate of exchange for the purchase of a ten thousand dollar draft on the National Bank of Greece. On the following day he purchased the draft from the Scandinavian-American bank of that city, and in payment thereof indorsed to the bank a cashier's check drawn by another bank in the same city. The Scandinavian-American bank, in the customary form, drew a draft on the National Bank of Greece, at Athens, for 132,460 drachmas (Greek money). At the same time the Scandinavian-American bank drew a draft in favor of the Guaranty Trust Company of New York upon the National Park Bank of the same city, to meet the draft which it had drawn upon the Greek bank. The National Park Bank was the Scandinavian bank's New York correspondent, but that bank was not a correspondent of the bank of Greece. The Guaranty Trust Company was such a correspondent. The money represented by the cashier's check which the Scandinavian bank received for the draft on Greece went into its general funds. On January 15, 1921, the bank commissioner, finding that the Scandinavian-American Bank was insolvent, took charge of

its affairs for the purpose of liquidation. The National Park Bank of New York was notified of this fact and it declined to pay the draft drawn upon it. Had the bank examiner not taken over the affairs of the Scandinavian bank, Spiroplos would have received credit in the Greek bank for the number of drachmas represented by the draft, because the draft drawn in favor of the Guaranty Trust Company upon the National Park Bank would have been paid in due course, there being funds in that bank sufficient to meet it.

On January 17, 1921, the National Park Bank charged off the deposit which the Scandinavian bank had with it against certain liabilities. Between the time when the draft was purchased and the time when the bank examiner took over the affairs of the Scandinavian bank, there was in the vaults of that bank more than sufficient money to cover it. Spiroplos presented a claim to the receiver of the Scandinavian bank, seeking to have a preferred claim in the money that he had paid for the draft. The receiver disallowed the claim as a preferred claim and allowed it as a general claim. The present action was brought to establish and recover the money paid over to the bank as a preferred claim.

The principal question in the case is whether, when Spiroplos purchased the draft and paid for it with a cashier's check, which we will treat as equivalent to cash, the transaction was one whereby the money going into the Scandinavian bank became a special deposit. If it were a special deposit, the right to recover would exist. Where it is sought to establish that the deposit was special, the theory of the action necessarily is the same as though the action were to recover property, and the fact that it is sought to recover property in a changed or substituted form does not change the

ground of recovery. In order to establish a special deposit, upon which the action is predicated, it was necessary for Spiroplos to show that the money which he paid into the bank at least came into the hands of a receiver in a substituted form and that it swelled the net assets thereof. *Rugger v. Hammond,* 95 Wash. 85, 163 Pac. 408; *Zimmerli v. Northern Bank & Tr. Co.,* 111 Wash. 624, 191 Pac. 788. It may be assumed that Spiroplos' money passed into the hands of a receiver in a substituted form, but the more serious question is whether it increased the net assets of the bank. The receiving of money on deposit by a bank does not ordinarily swell its assets because it creates a debt of the bank to the depositor equal to the amount of the money so received. In the *Rugger* case it was said, speaking of the money there involved:

"True this money in a sense went into the assets of the trust company, but so does all money which is deposited in a bank, since title thereto passes to the bank. It is not enough, however, for our present purpose that the money physically became a part of the trust company's assets, it must have actually swelled the net assets of the trust company and passed in some form to the hands of the receiver. Manifestly the receiving of money on deposit by a bank does not ordinarily swell its assets, for it creates a debt of the bank equal to the amount so received."

The question then arises whether, when the bank received Spiroplos' money and issued the draft, it created an obligation on the bank equal to the amount of money so received. If it did, the rule of the cases just cited would control. The bank, by drawing and delivering the draft, thereby agreed that, if it be duly presented, it would be accepted and paid by the drawee, and in case of default, if notified of the dishonor, would pay it. The drawee entered into no contract relations until

the draft had been accepted by it.  Up to that time the payee looked exclusively to the drawer for his protection.  In *Grammel v. Carmer,* 55 Mich. 201, 21 N. W. 418, in the opinion written by the late Judge Cooley, it was said:

"The drawer, by drawing and delivering the paper to the payee, agrees that if duly presented it shall be accepted and paid by the drawee, and that in default thereof he will, if duly notified of the dishonor, pay it himself.  The drawee enters into no contract relations with the payee in respect to it until it is presented to him, nor then unless he does so by acceptance.  If he accepts, he undertakes to pay according to the terms of the bill or of the acceptance; but up to the time of that act the payee looks exclusively to the drawer for his protection. . . ."

In *Clark v. Toronto Bank,* 72 Kan. 1, 82 Pac. 582, a resident of the state of Iowa sold some cattle in Woodson county, Kansas, through an agent there, who accepted in payment a check drawn on the bank of Toronto in that county.  The agent presented the check at the bank, and upon his request was given in payment a draft payable to the order of his principal, drawn by the Toronto Bank upon a Kansas City bank against a fund on deposit there to its credit.  Shortly afterwards the Toronto Bank was closed by the bank commissioner, and in due course of time a receiver was appointed.  A draft was presented for payment to the Kansas City bank, which having notice of the failure of the issuing bank, refused, for that reason, to pay it. The holder of the draft brought an action against the receiver and sought to recover from him the full amount of the draft, upon the theory that he was entitled to a preference.  It was said:

"In the petition an attempt was made to give the transaction described the color of a special deposit, or a contract for the transferring of a fund in specie

from Toronto to the plaintiff's home in Iowa. As clearly appears from the statement made, however, the facts will not bear that construction. The transaction was the ordinary one of the purchase of a draft for convenience in the remitting of money, and the giving to it of a different name cannot alter its essential character.''

In *Jewett v. Yardley,* 81 Fed. 920, it was held that the relation between the bank and the holder of drafts issued by it was that of debtor and creditor, and that the holder of the draft upon the bank that had become insolvent was not entitled to a preference. It follows, therefore, that the relation between Spiroplos and the Scandinavian bank, after the transaction of the purchase of the drafts, was that of debtor and creditor, and therefore the deposit was not special, because the net assets of the bank were not augmented by the transaction. The case of *Carlson v. Kies,* 75 Wash. 171, 134 Pac. 808, is distinguishable. There the money was placed in the bank to be held until the return of proper vouchers from heirs of an estate who lived in Sweden, and a receipt issued for the money. It was held that it was the obvious intent of both parties to the transaction to make a special and not a general deposit.

In the present case, the facts will not bear the inference that it was the intention of the parties to make the deposit special. In the briefs and in the argument, the transaction was referred to as a purchase of Greek money, but it was an ordinary transaction by which Spiroplos desired to have money placed to his credit in Greece, and the fact that the appellant may have thought he was purchasing Greek money does not change its essential nature. Upon the trial, the appellant offered to prove that the bank was insolvent on

the day the deposit was received, and for this reason a fraud was worked upon him.  Error is assigned upon this ruling, but it does not seem to be specially relied upon, though argued to some extent both orally and in the briefs.  There was no error in this ruling. Of the cases cited by the appellant, the one most nearly in point is that of *Widman v. Kellogg,* 22 N. D. 396, 133 N. W. 1020, 39 L. R. A. (N. S.) 563, but that case is different in its facts.  There, the bank had, at the time it drew the draft, no money on deposit with the drawee, and it was there said that, under the facts of that case, the cash assets of the insolvent bank were enhanced by the receipt of the money.  As above pointed out, under the doctrine of this court as stated in the case of *Rugger v. Hammond, supra,* the net cash assets of the Scandinavian bank were not enhanced.

The case of Dimos is in all essential particulars the same as that of Spiroplos, and it is not necessary to discuss this case in detail, as the result in both cases must be the same.

The judgment in each case will be affirmed.

PARKER, C. J., MACKINTOSH, MITCHELL, and TOLMAN, JJ., concur.