CROWDER, RECEIVER, *v.* ABBOTT.

[No. 25,964.   Filed December 22, 1931.]

*Louis B. Ewbank, Samuel Dowden* and *Charles H. Bedwell,* for appellant.

*Charles E. Henderson* and *Laurens L. Henderson,* for appellee.

MYERS, J.—Appellee filed with appellant, receiver of the Citizens' Trust Company, a claim for $60,000 and interest thereon for a certain period, alleging facts whereby he claimed preference in payment over all general creditors. On change of venue from the Sullivan Circuit Court, the cause was tried by the judge of the Knox Superior Court and a judgment rendered in favor of appellee in the sum of $35,557.80, as a preferred claim, and $25,398.06, as a general claim against the assets of the insolvent. On appeal, the errors assigned and not waived seek to question the action of the court in overruling appellant's motion for a new trial; the sustaining of appellee's motion to modify the judgment; the sustaining of appellee's motion that $557.80 interest be adjudged a preferred claim.

These assignments are but different methods of presenting to this court the question of evidence to sustain the general finding entitling appellee to preferential payment. The material facts most favorable to appellee's contention, whether disputed or not, follow: On May 23, 1921, appellee had certificates of deposit issued to him by the Citizens' Trust Company of Sullivan, Indiana, totaling $33,000; at that time, James M. Lang was president of this company and devoted all of his time to its affairs in the way of receiving deposits, paying out money, and had the general management and operation of its business; on this last date, appellee, while in the trust company's place of business, requested Mr. Lang to buy for him Fourth Liberty Loan bonds amounting to $60,000; he proposed to pay for them by cashing his certificates of deposit and a

certificate of deposit issued by an Arkansas bank for $28,500; such an unexpected demand on the trust company at that time, Lang thought, would seriously injure it; appellee and Lang then agreed that appellee should deposit with the trust company the Arkansas bank certificate, which was done, and $35,000 in Fourth Liberty bonds should then be purchased for appellee and the remainder of the bonds the next year; entries in the Liberty bond record of the trust company show that, on June 14, 1921, there was transferred for account of Abbott Fourth Liberty bonds, face value $35,000; on October 21, 1921, $15,000; on June 6, 1922, $8,000; and on September 12, 1924, $2,000; total $60,000. The records of the trust company show that, on September 12, 1924, it had $10,000 in Liberty bonds and on the 13th, $8,000; thereafter, and until January 20, 1925, additional bonds amounting to $750 were bought, and, on the latter date, $8,000 were sold. The books of the company also show that, between January 20, 1925, and January 26, 1927, when the Liberty bond account of the trust company was closed, various bonds in small amounts were bought and sold. During this latter period, the maximum amount of Liberty bonds at any one time on hand was, for one day, February 11, 1926, $2,708.80, and the minimum $500.

Lang testified that, in November 1923 or 1924, finally fixing the date as November, 1923, he sold bonds belonging to Abbott amounting to $35,000, and that the proceeds from these sales were credited to the trust company. These bonds, he says, were replaced, and, on September 12, 1924, Fourth Liberties, $60,000 par, were turned over to Abbott. This is the only evidence of any sale of Abbott's bonds and the only evidence tending to show that the trust company received anything on account of them. Appellee testified that, on this last date, he settled with Lang for the bonds and

they were delivered to him. After he had counted them, Lang said: "Now if you want to leave these bonds with us for safe keeping, we will be glad to take care of them for you." "I (appellee) told him that I would have to leave them some place and I would be perfectly willing to leave them with him and pay him for his trouble, if there were any charges." Lang assured him there would be no charges. The bonds, as they were purchased, both prior and after appellee had made settlement for them, were kept in Lang's safety deposit box in the vault of the trust company.

In the Liberty Loan box was found a receipt prepared by Lang, dated November 11, 1925, with appellee's name signed thereto for $60,000 Fourth Liberty Loan bonds. According to Lang, the transaction evidenced by the receipt occurred May 17, 1927, but, in order to help Abbott in his trouble with the income tax revenue officers, the receipt was given the date shown. Abbott denied receiving the bonds and declared that his name to the receipt was a forgery. There was expert evidence that Abbott signed the receipt, and also that his name to the receipt was not his signature.

In the latter part of May, 1921, appellee opened his first checking account with the trust company, and this account was given credit with the proceeds of the coupons from the bonds purchased as they became due. After September 12, 1924, and up to and including October 15, 1927, appellee's checking account received credit each six months for $1,275, which was the aggregate semi-annual coupon interest on $60,000 Fourth Liberty bonds. On June 17, 1927, appellee closed his account with the trust company by taking a draft for $2,300 in the name of John Kennedy, and $4 in cash. This account was reopened in November, 1927, or January, 1928, by a credit of $1,000, a part of the previous October bond interest, balance in cash. At the time the

bank was closed, he had a credit, as appears from the trust company's books, of $695.45.

The trust company closed its doors. February 21, 1928, and a receiver was appointed March 1, 1928. The only evidence of the trust company's assets turned over to the receiver were notes amounting to $13,882.50, and the only evidence of the trust company's liabilities were the claim of this appellee and that of others amounting to something over $11,000. The receiver refused appellee's demand for the bonds in question, stating that he did not have, never had had, and, to the best of his information, the trust company never had had, these bonds.

The evidence at bar justifies the inference that the trust company maintained in its place of business a vault and safe-deposit boxes therein for rent which were used for the safe-keeping of valuable papers, etc. In the instant case, however, appellee entrusted the bonds to an officer of the trust company who is shown to have received them into his custody for safe-keeping. There was to be no charge for this service, although, from the expression of Lang, the "no charge" statement might be construed as depending upon a continuance by appellee of his checking account, which is shown to have continued until June 17, 1927.

Lang, in his dealings with Abbott, acted authoritatively for the trust company (First Nat. Bank v. New [1896], 146 Ind. 411, 45 N. E. 597; Harris v. Randolph County Bank [1901], 157 Ind. 120, 128, 60 N. E. 1025; Crowder, Rec., v. Story. [1930], 90 Ind. App. 598, 169 N. E. 470), and, while the bonds in question were kept in the private safe-deposit box of Lang, yet they nevertheless must be regarded as being in the custody of the trust company. Appellee insists that, under the evidence in this case, the trust company held possession of the bonds as bailee for him, and, there-

fore, a trust relationship existed. Conceding his statement' to be correct, and construing the evidence favorable to him, the benefits of the bailment might be considered reciprocal, and hence the trust company would be required to use the same diligence in the care of appellee's bonds as it would in the care of its own securities, and for neglect of ordinary care, it would be liable for their value. *Sherwood* v. *Home Savings Bank* (1906), 131 Iowa 528, 109 N. W. 9; *In re Insolvency Farmers, etc., Bank* (1926), 202 Iowa 859, 211 N. W. 532, 51 A. L. R. 910; *Grenada Bank* v. *Moore* (1922), 131 Miss. 339, 95 So. 449; *Foster* v. *Essex Bank* (1821), 17 Mass. 479, 9 Am. Dec. 168; *First Nat. Bank* v. *Graham* (1875), 79 Pa. 106, 21 Am. Rep. 49.

The record in the instant case, as we are advised, is without evidence from which it can be said that appellee's bonds, or $35,000 of which, were used by the trust company in the transaction of its common or ordinary business, and that they were converted into other property which went to make up the general assets of the bank in the hands of the receiver. It is evident that appellee's bonds, prior to the appointment of a receiver, had been wrongfully converted or appropriated, but it is not shown that the assets of the trust company were augmented by these bonds. Under the circumstances here appearing, the trust company must be held responsible, but only to the extent that appellee is to be regarded as a general creditor, for, as it seems to us, it has been made to appear that appellee's bonds were either converted by an officer or employee of the trust company, or that the fund arising from the sale thereof had been completely dissipated, and that no part of it in any form ever came into the hands of the receiver. Such being the record of this case, appellee would not be entitled to a preferential payment by the receiver, for the reason, as we

have said, that none of the bonds, nor property substituted for them, nor the proceeds from the sale thereof, have been traced in any form into his hands. *Fletcher, etc., Trust Co.* v. *American State Bank* (1925), 196 Ind. 118, 147 N. E. 524; *Crowder, Rec.,* v. *Story, supra; Stults, Rec.,* v. *Gordon, Admr.* (1929), 89 Ind. App. 611, 167 N. E. 564; *Windstanley* v. *Second Nat. Bank* (1895), 13 Ind. App. 544, 41 N. E. 956; *Andrew* v. *Darrow Trust & Sav. Bank* (1927), 204 Iowa 870, 216 N. W. 553; *Andrew* v. *Farmers Savings Bank* (1929), 207 Iowa 394, 223 N. W. 249; *Andrew* v. *Darrow Trust & Sav. Bank* (1928), 204 Iowa 1317, 217 N. W. 438; *Morrison* v. *Lincoln Savings Bank, etc.* (1898), 57 Nebr. 225, 77 N. W. 655; *Miller* v. *Viola State Bank* (1926), 121 Kans. 193, 198, 246 Pac. 517, 48 A. L. R. 373; *Blumenfeld* v. *Union Nat. Bank* (1930), 38 Fed. (2d) 455; *Schuyler* v. *Littlefield* (1914), 232 U. S. 707, 34 Sup. Ct. 466, 58 L. Ed. 806; *Cherry* v. *Territory* (1906), 17 Okla. 221, 228, 89 Pac. 192, 8 L. R. A. (N. S.) 1254; *Nonotuck Silk Co.* v. *Flanders* (1894), 87 Wis. 237, 58 N. W. 383; *Freiberg* v. *Stoddard, Assignee* (1894), 161 Pa. 259, 28 Atl. 1111; *McNamara Tire Co.* v. *Pillsbury* (1928), 83 N. H. 417, 143 Atl. 468; *Bishop* v. *Mahoney* (1897), 70 Minn. 238, 73 N. W. 6; *Rugger* v. *Hammond* (1917), 95 Wash. 85, 163 Pac. 408, L. R. A. 1917D 613.

Our conclusion as to appellant's right to a new trial makes it unnecessary for us to notice the other two errors assigned.

From the foregoing consideration of this case, that part of the judgment allowing $60,955.06 as a general claim against the insolvent estate is affirmed, and that part of the judgment allowing $35,557.80 out of the $60,955.06 as a preferred claim over the general creditors is reversed, and, as to such preference, the motion

for a new trial is sustained and cause remanded for further proceedings not inconsistent with this opinion. It is further ordered that the costs of this appeal in this court be taxed one-half to each of the parties hereto.