[No. 1962-1. Division One. January 28, 1974.]

ALLIED SHEET METAL FABRICATORS, INC., *Appellant,* v. PEOPLES NATIONAL BANK OF WASHINGTON, *Respondent.*

*Reed, McClure, Moceri & Thonn, P.S.,* and *Hugh A. Mc-Clure,* for appellant.

*Karr, Tuttle, Koch, Campbell, Mawer & Morrow, Robert D. Morrow, Macbride, Sax & MacIver, D. Gordon Willhite, Davis, Wright, Todd, Riese & Jones,* and *Lawrence D. Studebaker,* for respondent.

SWANSON, C.J.—Allied Sheet Metal Fabricators, Inc. ("Allied") appeals from a summary judgment in favor of defendant Peoples National Bank of Washington ("Peoples") dismissing Allied's $2,000,000 claim for damages allegedly caused by Peoples' action in terminating its credit relationship with Allied.[1]

The affidavits considered by the trial court disclosed these undisputed facts: In a series of loans commencing in 1968, Peoples financed Allied's sheet metal fabricating plant under the terms of security agreements wherein Allied pledged accounts receivable and other collateral to secure the loans. Although at the outset the financing was done on the basis of term loans, after July 1, 1969, all loans, including those here in question, were made on the basis of demand promissory notes. After loaning Allied an additional $100,000 evidenced by two $50,000 demand notes executed October 8 and 9, 1970, respectively, Peoples decided on October 15, 1970, to take immediate steps to collect Allied's total accrued debt in excess of $420,000. Peoples acted by applying Allied's checking account deposits in the bank to the debt without prior notice to Allied with the result that checks outstanding issued by Allied totaling $38,593.12 were dishonored. On October 16, 1970, Peoples notified Allied of the action it had taken and demanded

---

[1]Prior to its successful motion for summary judgment, Peoples filed a third-party complaint against Seattle-First National Bank seeking contribution from the third-party defendant proportional to its interest in certain transactions with Allied in the event Allied obtained a judgment against Peoples.

payment of the entire loan balance which, after the offset of Allied's checking accounts in the amount of approximately $106,000, amounted to about $314,000.

The affidavit of Allied's president in effect claims bad faith on the part of the bank and states that the bank knew at the time the last two loans were negotiated on October 8 and 9, 1970, that the proceeds of such loans were "earmarked for the payment of specific liabilities and the general operation of the company, . . ."[2] The affidavit of

---

[2]The affidavit of Allied's president Joseph A. Price states in part: "A statement of accounts receivable pledged as security for the aforesaid loans was given by the plaintiff corporation to the defendant bank at intervals of one month or less. That all sums received by the plaintiff corporation in collecting on its accounts receivable were deposited in a collateral account with defendant bank and used to pay the existing loans.

"That on September 29, 1970, defendant bank loaned plaintiff corporation $50,000, Note No. 6648. That on October 8, 1970, defendant bank loaned plaintiff corporation $50,000, Note No. 6677. That on October 9, 1970, defendant bank loaned plaintiff corporation $50,000, Note No. 6697. That the defendant bank was well aware at the time the last two loans were negotiated, to-wit on October 8 and 9, 1970, that the proceeds of the loans were earmarked for the payment of specific liabilities and the general operation of the company, and that the plaintiff corporation wrote checks against the amount of said loans deposited in their general account with the defendant bank.

"That on or about October 15, 1970, according to the bank's records, there were the following notes outstanding:

"(See Exhibit 'C'.)

"That on October 15, 1970, without notice or demand to the plaintiff, the plaintiff's general and payroll accounts were debited by the defendant bank as follows:

"A) Payroll Account No. 05702273-3 of plaintiff corporation with defendant bank—$4,002.75;

"B) Allied Sheet Metal's General Account No. 05702272-5 — $63,041.53.

"That said debits by defendant bank left zero balances in both accounts.

"That demand for payment of the outstanding notes was not made by defendant bank until October 16, 1970. (See Exhibit 'D'.)

"That notes to the plaintiff's accounts receivable were mailed by defendant bank on October 16, 1970.

"That irreparable damage was done to the plaintiff's customers by the defendant bank's notice directed to plaintiff's accounts receivable, causing the plaintiff corporation monetary loss.

the bank's senior vice-president, Joshua Green III, stated in substance that Allied's entire indebtedness to the bank was based upon demand promissory notes, and that Allied's financial position was such that the bank had to exercise its rights to safeguard payment of the loan balance.[3] Thereafter, credit was given to Allied by Peoples to enable it to find other acceptable means of financing its operation, and on January 20, 1971, the balance of the indebtedness owing Peoples was paid. On the following day, Allied commenced suit against Peoples for $100,000 in damages, and later amended its complaint to claim $2,000,000.

In ruling on Peoples' motion for summary judgment, the trial judge resolved the primary question in issue by making this succinct analysis:

The continuing practice of financing does not change the rights of the parties under written notes and written security agreements. The parties did not have an agree-

"That defendant bank knew that the plaintiff corporation was completely dependent upon defendant bank for its financial operation. That all the deposits to the plaintiff's general account came from loans by defendant bank and that all deposits made by Allied were credited to the collateral account and used to pay existing loans. That the bank had systematically and regularly loaned plaintiff sums of money for 32 months to finance the plaintiff's operations."

[3]The affidavit of Joshua Green III, senior vice-president, states in part: "On October 16, 1970, in conjunction with the notice to the corporation [Allied], an offset of the funds in the corporate general checking account was applied to the outstanding obligation in the sum of $63,041.53. In addition, the balance of the Bank owned collateral account was applied to the indebtedness in the sum of $43,052.68. The corporation's payroll account having a balance of $4,002.75 was place[d] on a Bank control system to assure that the payroll checks issued by the corporation would be examined and paid. Notification that the payroll checks would be cleared was given to the corporation's bookkeeper.

"Thereafter, one check in the sum of $96.81, payable to Harvey Miller was not paid through an inadvertent mistake by an employee at the Computer Center. Affiant believes that all other payroll checks issued against the deposit of $4,002.75 were paid and the $96.81 check was paid upon representment. During this period of time it was the Bank's intention and affiant's direction that all payroll checks properly presented be paid from the funds available in the corporate payroll account."

ment for continuing financing with an agreement calling for notice either orally or in writing. They had a practice of executing continued demand notes. Demand notes with the security agreements here executed indeed put the bank in a position where if it takes action, as a practical matter, the company is in trouble because it has lost its financing, but that is the agreement that the parties made by appropriate written instruments.

The plaintiffs indicate that the question is, does the bank have a right to call in these notes and offset these accounts without notice. The legal answer is yes, because they are demand notes, because that is the contract that the parties made.

Following this summary of the legal relationship of the parties, the trial court concluded that there was no genuine issue as to any material fact and granted summary judgment of dismissal. This appeal follows.

Allied's argument is essentially that Peoples breached its contract with Allied (1) by claiming the entire balance of Allied's indebtedness due without a declaration of default pursuant to the terms of the security agreement, and (2) by failing to make any demand for payment prior to the setoff of Allied's debt against its bank accounts. Therefore, Allied contends Peoples had no right to apply the bank accounts to Allied's debt and alleges that such misappropriation of the checking account funds resulted in the wrongful dishonor of Allied's checks to suppliers, creditors and employees and caused the damages claimed.

 We are of the opinion that Allied's assertion of breach of contract is based on a misconception of what constituted the agreement between the parties. Allied apparently believes that the general written security agreement between the parties constituted a contract guaranteeing continued financing which could not be terminated without a formal declaration of default pursuant to that agreement even though the loans in question were all based on demand promissory notes. We are persuaded that the trial court, based upon the undisputed facts, correctly interpreted the nature of the agreement between the parties, and that agreement is expressed on the face of the demand

notes. In short, the provisions of the security agreement are irrelevant and simply not applicable to the actions of Peoples challenged by Allied, because such actions were based on the uncontroverted terms of the demand notes. In this connection, contrary to appellant's contention, the mere fact that Peoples had provided financing to Allied continuously since 1968 effected no change in the terms of the demand notes and did not alter the rights of the parties thereby created.[4] Allied failed to set forth any facts which indicate a commitment by Peoples for continued financing or extension of credit and therefore the demand notes, which indicate the contrary, are controlling.

Further, it is apparent that Allied's affidavits create no issue of fact, for they only show that Allied was a borrower from Peoples and that its loans were evidenced by demand promissory notes. The additional facts stated in Allied's affidavit that its obligations were secured by collateral pursuant to security agreements, that money had been loaned over a period of years, and that the bank notified debtors of Allied's accounts receivable to pay directly to Peoples

---

[4]Note No. 6600 201 for $100,000 executed September 17, 1970, is typical of the notes involved and states in pertinent part as follows: "On Demand After Date, We promise to pay to the order of Peoples National Bank of Washington at its Dexter & Broad Branch, Seattle, Washington, $100,000 DOLLARS, for value received, with interest thereon at the rate of 9½ per cent per annum from date until paid, interest payable at maturity. Principal and interest payable in Lawful Money of the United States. For value received, each and every party to this note binds himself, jointly and severally, hereon as principal and not as surety, and all parties hereto, including indorsers, sureties, and guarantors, hereby severally waive presentment, demand, protest, notice of non-payment hereof, any release or discharge arising from any extension of time, discharge of a prior party, or other cause other than actual payment in full hereof, and promises, in case suit is instituted to collect the same or any portion hereof, to pay such sum as the Court may adjudge reasonable in such suit as attorneys fees. At the option of the holder, the venue of any such suit may be laid in the county where this note is payable. Collateral Ass'd A/C Allied Sheet Metal Fabricators, Inc. P.O. Box 7379, 98133. Joseph A. Price, Pres."

bank, are nondeterminative of any issue in the case. We conclude that Peoples met its burden of showing that no genuine issue as to any material fact exists.[5]

It is elementary that a demand note is payable immediately on the date of its execution. The general rule is well stated in 11 Am. Jur. 2d *Bills & Notes* § 286 (1963):

> An instrument is payable immediately if no time is fixed and no contingency specified upon which payment is to be made. A demand note is payable immediately on the date of its execution—that is, it is due upon delivery thereof; and, unless a statute declares otherwise, or a contrary intention appears expressly or impliedly upon the face of the instrument, a right of action against the maker of a demand note arises immediately upon delivery and no express demand is required to mature the note or as a prerequisite to such right of action, commencement of a suit being sufficient demand for enforcement purposes.

(Footnotes omitted.) RCW 62A.3-122 (1) states in part:

> A cause of action against a maker or an acceptor accrues
>
> . . .
>
> (b) in the case of a demand instrument upon its date or, if no date is stated, on the date of issue.

*See also Northwestern Nat'l Bank v. Pearson,* 102 Wash. 570, 173 P. 730 (1918). A second principle fundamental to banking practice which deserves emphasis is that the relationship of a depositor to the bank is that of a creditor to a

---

[5]Allied strenuously argues that there is a factual question regarding the bank's alleged lack of good faith in loaning money on October 8 and 9, 1970, and then waiting until checks were written on such funds, which were deposited in Allied's general checking account, before declaring the notes due and owing and transferring the checking account funds to apply on the debt. Allied suggests this conduct violates RCW 62A.1-203 which states in part: "Every contract or duty within this Title imposes an obligation of good faith in its performance or enforcement." *See also* RCW 62A.4-103. Although these facts might raise questions as to the bank's business judgment, they create no factual issue as to the bank's right to do what it did, and so are not material facts. This is particularly so under our interpretation of what constituted the agreement between the parties, namely, the terms of the demand notes.

debtor, the bank being the debtor. This basic rule of banking law is explained in 10 Am. Jur. 2d *Banks* § 339 (1963):

> Although money on deposit in a bank is commonly considered to be the property of the depositor, the relationship in fact between him and the bank is that of debtor and creditor; the amount on deposit represents merely an indebtedness by the bank to the depositor. It is therefore a fundamental rule of banking law that in the case of a general deposit of money in a bank, the moment the money is deposited it actually becomes the property of the bank, and the bank and the depositor assume the legal relation of debtor and creditor.

(Footnotes omitted.) *See Carlson v. Kies,* 75 Wash. 171, 134 P. 808 (1913). *See also State ex rel. Graham v. Olympia,* 80 Wn.2d 672, 497 P.2d 924 (1972).

█ In the case at bar, although the bank occupied the position of debtor regarding Allied's various checking accounts, it was of course Allied's creditor as to loans. In view of this debtor-creditor relationship between the parties, we hold Peoples had the right to setoff its indebtedness —the amount Peoples owed Allied arising out of Allied's checking account deposits—against Allied's indebtedness— the amount Allied owed Peoples because of Peoples' loans to Allied.

> It is a general rule that when a depositor is indebted to a bank, and the debts are mutual—that is, between the same parties and in the same right—the bank may apply the deposit, or such portion thereof as may be necessary, to the payment of the debt due it by the depositor . . .

10 Am. Jur. 2d *Banks* § 666 (1963). *See also Walton Lumber Co. v. State Bank,* 140 Wash. 133, 248 P. 82 (1926); *Commercial Bank & Trust Co. v. Minshull,* 137 Wash. 224, 242 P. 29 (1926); *Conner v. First Nat'l Bank,* 113 Wash. 662, 194 P. 562 (1921); *Bank of Cal. v. Starrett,* 110 Wash. 231, 188 P. 410, 9 A.L.R. 177 (1920); *Hanson v. Northern Bank & Trust Co.,* 98 Wash. 124, 167 P. 97 (1917).

Allied argues, however, that the foregoing general rule permitting a setoff in the case of a demand note does not apply until after the bank exhausts its primary collateral

security, and Peoples failed to do this. In this regard, Allied relies primarily upon an early California case, *McKean v. German-American Sav. Bank*, 118 Cal. 334, 50 P. 656 (1897); however, *McKean* states a minority view, and we decline to follow it. The position adopted by the majority of modern jurisdictions is well expressed in *Olsen v. Valley Nat'l Bank*, 91 Ill. App. 2d 365, 371, 234 N.E.2d 547 (1968), as follows:

> A bank should not be deprived of its right of set-off simply because it has the foresight to obtain collateral in exchange for obligations owed to it. The majority rule, including Illinois, is founded on the rationale that a creditor is able to pursue any one of a number of remedies against a debtor until the debt is satisfied. The minority rule is based upon the rule or statute that there is but one action for the recovery of a debt which is secured by collateral.

Although there appears to be no Washington authority directly in point, we are persuaded that the better reasoned view is that expressed in *Olsen* which recognizes the multiple remedies of a creditor, and therefore we apply that rule to the case at bar. *See Peoples Nat'l Bank v. Peterson*, 7 Wn. App. 196, 498 P.2d 884 (1972), *aff'd*, 82 Wn.2d 822, 514 P.2d 159 (1973).

Allied also challenges Peoples' right of setoff on the basis of a generally recognized exception to that right which prohibits such setoff in the case of special purpose accounts. Allied argues that this exception applies here because Peoples exercised its right of setoff against Allied's payroll account which Allied contends is a special purpose account. *See Spiroplos v. Scandinavian-American Bank*, 116 Wash. 491, 199 P. 997, 16 A.L.R. 181 (1921).

Assuming arguendo that Allied's payroll account was a special account, Allied's argument may have presented an issue of fact; however, the affidavit of the bank's senior vice-president, Joshua Green III, states that the payroll account was not offset but rather was placed on a control basis and that all payroll checks were, in fact, paid, with the exception of one, and that this check was paid upon

representment. Further, although an affidavit of one of Allied's employees indicates that a payroll check presented on October 16 was dishonored, he does not deny that it was paid upon representment. We conclude that under such circumstances, there is no issue of fact, and any damage would be de minimus.

Allied's final contention is that even if the bank was authorized notwithstanding the terms of the security agreement to do what it did, *i.e.*, offset Allied's checking account balance against its debt to the bank without prior notice or hearing, the bank's actions nevertheless constituted an unlawful taking of property in violation of the due process provisions of the fourteenth amendment to the United States Constitution and article 1, § 3 of the Washington State Constitution. We reject this contention for these reasons: First, appellant premises its argument attacking the bank's actions on the erroneous assumption that the bank's authority for taking the steps it did rested, if at all, upon the terms of the security agreement. As we have previously indicated, the controlling authority for the bank's actions is not the security agreement but the contract formed by the demand notes and the rights created by the debtor-creditor relationship of the parties.

Secondly, Allied fails, by either argument or citation of authority, to support its assertion that the bank's actions in these circumstances amount to a deprivation or a taking of a significant property interest. Inasmuch as Allied's deposits to its checking account became the bank's property upon deposit and Allied was merely the bank's creditor as to such deposits, the question arises whether the bank's actions properly may be characterized as a seizure or taking of Allied's property. In any event, we need not decide this question in the absence of a showing by Allied that there was significant state involvement in the alleged taking, which is a necessary prerequisite to the implementation of due process protections. It has been consistently recognized in the cases dealing with the "state action" question that the conduct of private individuals, no matter

how wrongful, does not fall within the ambit of the constitutional prohibition unless the government is involved to some significant extent in the private conduct which violates due process rights. *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 32 L. Ed. 2d 627, 92 S. Ct. 1965 (1972); *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 6 L. Ed. 2d 45, 81 S. Ct. 856 (1961).

Allied argues that state action may be found if private acts, which would be unconstitutional if done by a public body, are judicially enforced. In support of its argument, Allied directs us to *Shelley v. Kraemer,* 334 U.S. 1, 92 L. Ed. 1161, 68 S. Ct. 836, 3 A.L.R.2d 441 (1948), which dealt with judicial enforcement of a racially discriminative covenant, and *Reitman v. Mulkey,* 387 U.S. 369, 18 L. Ed. 2d 830, 87 S. Ct. 1627 (1967), where the state was found to be sufficiently involved to support a challenge to the constitutionality of a proposition approved by the electorate of the state of California aimed at repealing fair housing laws.

Allied's reliance on the cited cases which involved racial discrimination is misplaced in the context of the question presented here as to whether state action may be found in nonjudicial self-help between private parties. *See Oller v. Bank of America,* 342 F. Supp. 21 (N.D. Cal. 1972). In the case at bar, the judiciary is not being asked to enforce what the bank has done, nor to grant affirmative relief. We have here a private transaction between a borrower and a lending institution, and the actions complained of were taken without seeking state help and without any involvement of state officials. As the court observed in *Oller,* which involved self-help repossession pursuant to a private contract, at page 23:

> The Bank is not a governmental or even quasi-governmental agency; no government official acts with the Bank in the matter of repossession; the act of repossession is not compelled; the authority to repossess is based on a contractual right which had been judicially approved prior to the adoption of the statutes in question.
>
> What we have here is a private act taken by a private organization to protect its security interest in personal

property that is subject to a conditional sales contract. The courts have been almost uniform in refusing to color such transactions as "State actions." [Citation omitted.]

We note that appellant places principal reliance in its brief upon *Adams v. Egley*, 338 F. Supp 614 (S.D. Cal. 1972), decided prior to *Oller*, in which the court found sufficient state action in a bank's repossession of property, pursuant to a private contract, on the basis of the fact that certain provisions of the Uniform Commercial Code had been incorporated into the contract; however, subsequent to the oral argument in this case, *Adams* was reversed on appeal. *See Adams v. Southern Cal. First Nat'l Bank*, 42 U.S.L.W. 2230 (U.S. Oct. 30, 1973), petition for rehearing en banc pending.

Therefore, assuming without deciding that Allied was deprived of a significant property interest by the bank's action of setoff, we nevertheless find no significant state involvement and therefore we cannot sustain Allied's position on the basis of the federal and state constitutional prohibitions against the taking of property without due process of law.

Judgment affirmed.

FARRIS and JAMES, JJ., concur.

Petition for rehearing denied March 19, 1974.

Review denied by Supreme Court May 21, 1974.