*31 MR. JUSTICE WEBER,
dissenting:
I dissent because I conclude there was insufficient evidence to sustain the compensatory damage award. I also conclude that the Bank properly exercised its right of set-off.
A brief review of facts during the months of May, June and July, 1983 will help to demonstrate the financial problems on the part of NLL. Bank officers testified that it was their understanding that NLL was doing all of its business with the Bank. The Bank had no knowledge of the borrowings from Mr. Tisor. The evidence established that NLL borrowed $75,000 from Mr. Tisor in May and another $65,000 on July 11, 1983. On June 6, 1983, the Bank loaned NLL $140,000 as evidenced by the note discussed in the majority opinion. On June 7, NLL used $55,000 of that loan to pay to Mr. Tisor. Bank officer Reeve testified that the Bank would not have made the loan had it known that it would have been used to repay a debt. The understanding on the part of the Bank was that the $140,000 was to be used for the year’s operating expenses.
On July 18, 1983, Mr. Reeve and Mr. Bottrell of NLL came into the Bank to disclose their serious financial problems. The $140,000 note was due in October 1983. NLL was concerned that they would not be able to pay that note when it came due. NLL was having significant problems in maintaining its business at a level comparable to earlier years. Bank president Beaton testified that the July 18 disclosures by Mr. Bottrell and Mr. Reeve caused a great deal of concern. His basic question was, what happened to the $140,000 which had been loaned to NLL? This sum had been expected to finance NLL through 1983. Mr. Beaton’s concern turned to alarm on July 20 when while reviewing the checks going through NLL he discovered a check to Mr. Tisor in the amount of $26,000, with a notation on the check that it was for a loan payment. It became apparent that NLL was borrowing from an unknown third party. This created a crisis which demanded immediate action on the part of Mr. Beaton as he had to either pay the Tisor check or refuse payment. The Bank could choose to allow a preferential payment to another creditor or to apply the money to its own indebtedness. At that point Mr. Beaton concluded that the Bank was insecure and exercised its right to a set-off. In the next two days NLL did not provide any satisfactory financial statements. In addition NLL did not give any explanation of the Tisor loans.
The evidence submitted at trial demonstrates that on July 20, 1983, NLL indeed was in serious financial straits. While the gross *32 revenue figures for NLL showed the following: 1981 — $599,000, 1982 — $538,000, and 1983 — $1,288,000, the net income was limited to the following: 1981 — $7500, 1982 — $6475, and 1983 — a loss of over $18,000. Originally NLL had reported to the Bank a 1982 net income of $24,500. Although this figure was corrected to the $6475, the Bank was not given the corrected information. In addition, the company’s own CPA and Mr. Howard, an accounting professor who analyzed NLL’s financial situation, testified that on July 20, 1983, NLL’s asset to liability ratio indicated insolvency.
The record contains substantial evidence demonstrating that NLL had significant problems in 1983 arising from its inability to obtain additional contracts, and that the likelihood of making money from which the debts could be repaid was clearly questionable. The overall picture reveals a company with serious financial problems which was attempting to maintain an appearance of “performing as agreed.” Such picture also reveals that from the Bank’s viewpoint, NLL was “borrowing from Peter (Bank) to pay Paul (Tisor).”
With this background information, let us now consider the compensatory damages award. The majority concluded that there was insufficient evidence to justify the judgment of $500,000 and reduced the same to $312,000. As I review the evidence, I conclude that the $312,000 award still clearly is speculative. Even if we assume that the Bank caused injury to NLL, NLL still failed to prove actual damages which resulted from the Bank’s conduct. NLL did not even attempt to prove its lost profits. While it argued that its net worth had been reduced, it failed to prove the amount of such reduction in value. The record does not contain a basis to justify $312,000 of compensatory damages.
The compensatory damage verdict was not broken down into its component parts so we do not know the elements which the jury included in that award. It appears that the basis for compensatory damages would be a reduction in the net value of the company, or the loss of profits. While there was testi-mony indicating that a liquidation value might be $312,000, no specific evidence was presented to demonstrate the extent of the reduction in net value as a result of the Bank’s action.
Damages may only be awarded for lost profits if NLL proved that there were lost profits and that such lost profits resulted from the Bank’s action. The amount of lost profits most be established to a reasonable certainty using the best evidence available under the circumstances.
*33 In Stensvad v. Miners & Merchants Bank, Etc. (1982), 196 Mont. 193, 640 P.2d 1303, we stated:
“Damages for loss of profits may be awarded if not speculative. Silfvast v. Asplund (1935), 99 Mont. 152, 161, 42 P.2d 452, 456. The rule that prohibits speculative profits does not apply to uncertainty as to the amount of such profits but to uncertainty or speculation as to whether the loss of profits is the result of the wrong and whether such profit would have been derived at all. Tri-Tron Intern. v. Velto (9th Cir. 1975), 525 F.2d 432, 437. Once liability is shown, that is the certainty that the damages are caused by the breach, then loss of profits on a reasonable basis for computation and the best evidence available under the circumstances will support a reasonably close estimate of the loss by a District Court. Smith v. Zepp (1977), 173 Mont. 358, 370, 567 P.2d 923, 930. But no damages are recoverable which are not clearly ascertainable both in nature and origin, and only profits which are reasonably certain may be awarded. Smith v. Fergus County (1934), 98 Mont. 377, 386, 39 P.2d 193, 195. (Emphasis supplied.)”
While precision is not required in calculating damages, the evidence must be sufficient to afford a reasonable basis for determining the specific amount awarded. Cremer v. Cremer Rodeo Land and Livestock Co. (1981), 181 Mont. 87, 627 P.2d 1199. In Cremer the lost profit award was sustained because specific evidence was presented. However, in Stensvad the award of lost profits was speculative since no profit record prior to the breach of contract was presented. This Court has recently vacated damage awards as having no foundation in the record. See Bolz v. Myers (1982), 200 Mont. 286, 651 P.2d 606. In Lenz Const. Co. v. Cameron (1984), 207 Mont. 506, 674 P.2d 1101, this Court affirmed the district court’s denial of unproven damages.
Initially, NLL most show that it was in fact damaged by the Bank’s actions. There was testimony indicating that NLL lost its competitive edge, and was unable to bid on certain Idaho projects as a result of losing its source of financing. NLL did establish that it was required to share profits under a joint venture-subcontract arrangement with Bonneville. While there is proof of the sharing of profits, there is no demonstration that this resulted in actual financial loss to NLL. Obviously the contract had been let to Bonneville and this was the means through which NLL participated in another company’s project. The record would allow a conclusion that NLL *34 would have been required to participate in such a joint venture arrangement even without regard to conduct on the part of the Bank.
There was evidence presented indicating that other factors entered into the company’s profitability in the years 1983 and following. Mr. Bottrell testified that the workload for 1983 prior to the set-off was lighter than usual. Additionally, Mountain Bell had begun accepting bids from non-union bidders, making it difficult for NLL to bid competitively since it paid union wages. Mountain Bell had cut its RTIP contracts in half; thus there were less available projects to bid on. In addition, all of the 1983 RTIP contracts had already been awarded by June of 1983.
Even though we accept the evidence which demonstrates a breach of obligation on the part of the Bank, the amount of any damage arising from that breach was actually left to speculation. In addition to the Bonneville joint venture, there was testimony that NLL paid $130,500 to Morrises through the joint-venture arrangement, but there is nothing to show how that was specifically related to the conduct of the Bank.
Here NLL had an accountant familiar with the books and records of the corporation who testified only as to years prior to the time in controversy. Had he been given the opportunity to do so, that accountant could have reviewed the books and records of NLL and submitted direct testimony of the net profits earned in 1983, 1984 and any other relevant year. Obviously NLL chose not to submit that kind of information. Instead it made loose references to gross profit figures which were large in amount. Witnesses referred to the value of NLL and argued for reimbursement for the damage done to NLL which had been forced out of business. Clearly NLL chose not to offer specific evidence of lost profits and other actual losses. I can only assume that its choice arose from a prior conclusion that there were not sufficient losses to justify a substantial award.
I therefore disagree with the $312,000 damage award. Such an award affirms the trial procedure used here. By focusing on the claimed outrageous conduct on the part of the Bank, NLL was successful in convincing the jury that a significant amount of compensatory damages was required. It seems likely that something in the nature of a penalty or punitive aspect was included. Regardless of any sense of outrage on the part of the jury, the record fails to disclose adequate evidence of compensatory damage. I would vacate the compensatory damage award of $500,000 and remand for a new trial.
*35 I will now discuss the $140,000 demand note. The District Court determined as a matter of law that the note was not a demand note, and the majority has reached the same conclusion. I do not agree. The language of the $140,000 note clearly states, “Upon demand, Borrower promises to pay to Bank.” The instrument also states, “If no demand is made, Borrower shall pay 120 days after the date of this note.” It also recites an actual due date of 10-4-83. These statements are consistent with each other. To state that payment is due in 120 days does not mean that the financial institution could not demand payment prior to the 120 days.
The majority finds that the due date takes this note out of the § 30-3-108, MCA, definition of a demand note. However, the statutory definition is not this narrow. In referring to this same definition the Oregon Supreme Court in Seattle-First Nat. Bank. v. Schriber (1978), 282 Or. 625, 580 P.2d 1012, 1013, stated, “The drafters obviously felt no need to state the obvious, that demand instruments also include instruments made expressly payable ‘on demand’.” Initially therefore the note in question meets the definition of a demand note.
Courts have held as a matter of law that a note with similar language is a demand note. In Rogers v. Security Bank of Manchester (8th Cir. 1981), 658 F.2d 638, the borrower argued that a payment schedule contained in the note demonstrated an intent that the note was to be an installment obligation. The court, however, refused to ignore the language of the note which stated “on demand and until demand be made.” The court concluded that the payment schedule only clarified how the debt should be paid, assuming no demand was made. Rogers, 658 F.2d at 639. This is comparable to the present note which only requires payment in 12Ó days assuming no demand has been previously made.
The Fifth Circuit also upheld a determination that a promissory note was a demand note in International City Bank and Trust Co. v. Morgan (5th Cir. 1982), 675 F.2d 666. In that case two notes contained language stating “payable on demand or two years after date.” On each note a due date was typed in the margin. On a summary judgment motion, the District Court ruled that the language, even coupled with the marginal due dates, was clear and unambiguous, constituting a demand note. The federal court upheld this determination, stating “the notes were payable on demand, and in the absence of a demand, two years after execution.” Morgan, 675 F.2d at 668. Again this is directly comparable to the present note.
*36 Courts finding that inconsistent language brings a note out of demand status, often consider several factors which would tend to negate the demand nature. See Shaughnessy v. Mark Twain State Bank (Mo.App. 1986), 715 S.W.2d 944, (where a deed of trust securing the note listed eight events of default and a modification and extension of the note did not contain the word “demand”); Reese v. First Missouri Bank & Trust Co. (Mo.App. 1984), 664 S.W.2d 530, (holding that a note which stated “upon demand”, yet set out a specific repayment schedule, was not a demand note).
At a minimum, the nature of the note was a jury issue. In Schriber, the Oregon Supreme Court remanded for a jury determination of whether the instrument was a demand note. In that case the note was payable “on demand, but no later than 180 days.” As in the present case, a due date had been typed in. The court stated that this language “creates an ambiguity not susceptible to resolution as a matter of law.” Schriber, 580 P.2d at 1013.
The majority also calls attention to the language in the note which calls for an increase in the interest rate upon default. This however, does not take the note out of demand status, but may mean that an actual demand is necessary. Peterson, 432 P.2d at 451. See also Bank of Nevada v. United States (9th Cir. 1958), 251 F.2d 820, 827; 10 C.J.S. Bills and Notes § 247 (1938).
The majority goes on to state that no actual demand was made. I disagree with that conclusion. Initially, it should be emphasized that no demand is necessary to mature a demand note. “As a general rule, notes payable on demand are due and payable immediately after execution, and no further demand is necessary to mature them.” Peterson, 432 P.2d at 451. Further, the note signed by NLL specifically stated, “Borrower waives presentment, demand for payment, protest, notice of dishonor, and notice of every other kind.” Thus under the wording of the note, demand was unnecessary. The majority disregards this express contractual provision.
However, even if actual demand were necessary, the set-oif itself constituted a demand. This was an affirmative action by the Bank sufficient to put NLL on notice that payment was due. It is difficult to conceive of a method which would more clearly convey to the borrower that payment of the indebtedness was being demanded. In Peterson, cited by the majority, a letter which called for complete liquidation of indebtedness was sufficient demand to put parties on notice that payment was due. In the present case, the Bank notified Mr. Bottrell and Mr. Reeves on July 20, 1983 that its bank account *37 in the amount of $66,000 had been set off against this note. In substance both Mr. Bottrell and Mr. Reeves were advised directly that their $66,000 had been taken by the Bank and applied on the note. This clearly conveyed a demand for payment to NLL. Both bankers testified that the note was due at that point. Mr. Reeves testified that had NLL been able to shore up the note with additional collateral, money, or a guarantor, the note would have been rewritten, but in any event, note 14463 was due. I conclude that the set-off by the Bank was sufficient to constitute a demand for payment.
Even though the majority does not accept my analysis of the demand nature of the note or the making of a demand, I do not understand how these become issues of law. At a minimum it appears that the questions to be submitted to the jury should include whether or not this was a demand note and whether or not an actual demand had been made.
The status of the note also governs the Bank’s right of set-off. Since a demand note is a matured obligation, the Bank can exercise its right of set-off at any time. Allied Sheet Metal Fab., Inc. v. Peoples National Bank (1974), 10 Wash. App. 530, 518 P.2d 734.
Furthermore, the majority states that even if the security agreement applied to this note, the Bank must exhaust the collateral before exercising its right of set-off. While Montana has not addressed this issue, the majority rule was expressed in Allied Sheet Metal, as follows:
“Allied argues, however, that the foregoing general rule permitting a setoff in the case of a demand note does not apply until after the bank exhausts its primary collateral security, and Peoples failed to do this. In this regard, Allied relies primarily upon an early California case, McKean v. German-American Sav. Bank, 118 Cal. 334, 50 P. 656 (1897); however, McKean states a minority view, and we decline to follow it. The position adopted by the majority of modern jurisdictions is well expressed in Olsen v. Valley Nat’l Bank, 91 Ill.App.2d 365, 371, 234 N.E.2d 547, 550 (1968), as follows:
“ ‘A bank should not be deprived of its right of set-off simply because it has the foresight to obtain collateral in exchange for obligations owed to it. The majority role, including Illinois, is founded on the rationale that a creditor is able to pursue any one of a number of remedies against a debtor until the debt is satisfied. The minority rule is based upon the rule or statute that there is but one action for the recovery of a debt which is secured by collateral.’ ”
518 P.2d at 739.
*38 Accordingly, I would conclude that the bank was not required to exhaust the collateral before setting-off the deposit. As a demand instrument, the note was mature, and the borrowers waived actual demand. I would therefore conclude that the Bank properly and lawfully exercised its right of set-off against this note.
I would reverse the judgment and remand for new trial.
MR. CHIEF JUSTICE TURNAGE and MR. JUSTICE GULBRANDSON concur in the foregoing dissent of MR. JUSTICE WEBER.