143 F.3d 502
 98 Cal. Daily Op. Serv. 3185, 98 Daily Journal
D.A.R. 4396
RELIANCE INSURANCE CO., a Pennsylvania Corporation, Plaintiff-Appellee,
v.
U.S. BANK OF WASHINGTON, N.A., a National Banking
Association, Defendant-Appellant.
 No. 95-35872.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 10, 1996.
Decided April 29, 1998.
 
 John C. Merkel, Caine McLaughlin, P.S., Seattle, WA, for plaintiff-appellee.
 Peter S. Holmes, Miller, Nash, Wiener, Hager & Carlsen, Seattle, WA, for defendant-appellant.
 Appeal from the United States District Court for the Western District of Washington; Thomas S. Zilly, District Judge, Presiding. D.C. No. CV-93-00705-TSZ.
 Before: NOONAN, THOMPSON and KLEINFELD, Circuit Judges.
 KLEINFELD, Circuit Judge:
 
 
 1
 This is a dispute between a bank and a surety over which of them gets a government payment into a defaulting contractor's bank account.
 
 FACTS
 
 2
 The case was adjudicated on cross motions for summary judgment. The facts below are those set out in affidavits, stipulations, and other materials as to which there is no dispute.
 
 
 3
 Kruse Construction got a government contract to improve a Coast Guard station at Cape Disappointment, Washington. Because it was a federal project, laborers and materialmen were secured by a surety bond pursuant to the Miller Act, 40 U.S.C. § 270a(a)(2), instead of the mechanics liens they would have had if the project had been a private one. Reliance Insurance Company wrote the surety bond. U.S. Bank of Washington provided the construction loan. Pursuant to an approved assignment from the contractor to the bank, the government wired progress payments directly into the contractor's account at the bank.
 
 
 4
 The contractor ran into financial difficulties in the spring and early summer of 1992. By the first of June, numerous subcontractors had given notice to the surety of unpaid claims. The contractor's cash flow problems were severe by mid-June.
 
 
 5
 The money at issue in this case was paid out June 19, 1992. On that date, the Coast Guard deposited $280,319 into the contractor's bank account by wire transfer. The bank knew on that date that the contractor was having financial problems, but did not know that subcontractors had not been paid. The surety knew on June 19 that subcontractors had not been paid, but did not know that the progress payment had been made.
 
 
 6
 Four days after the money was deposited, on June 23, the contractor declared itself in default. With the surety's cooperation, the contractor notified laborers and materialmen that it could not pay its bills. The contractor also notified the government that it was in default and consented to payment of any moneys due from the government to the surety instead of the contractor. On that day or the next, the surety notified the bank of its claim that the June 19 deposit should be disbursed to laborers and materialmen. The surety's interest was of course that whatever was paid out of the Coast Guard deposit in the bank to laborers and materialmen would reduce what the surety would otherwise have to pay them.
 
 
 7
 The bank took the position that it had first claim on the money. It decided to treat the June 19 progress payment as a setoff against what the contractor already owed the bank. Thus as a practical matter, the bank rather than the surety got all the benefit of the government's progress payment. The surety was stuck with paying the laborers and materialmen out of its own money, subject to its right to have the contractor indemnify it, an illusory right because the contractor was broke.
 
 
 8
 The surety sued the bank, on the theory that the surety should have had the benefit of the June 19 progress payment. The district court granted summary judgment in favor of the surety. The bank appeals.
 
 ANALYSIS
 
 9
 The district court, applying Washington law, held that the bank converted the money, because it knew on June 23 that the contractor was in default, and that as of that date, the surety had an equitable lien superior to the bank's. No party claims that genuine issues of material fact precluded summary judgment. The appeal questions application of the law to the undisputed facts. We find the questions exceedingly difficult, but respectfully conclude that in the circumstances, the bank was entitled to the offset it took, and reverse.
 
 
 10
 I. Choice of Law.
 
 
 11
 We agree with the district judge that the State of Washington was the correct source of law. There is not really a conflict between state and federal law, or between the law of one state and another. Nevertheless, we have found it necessary to consider choice of law so that we know where to look for authority. Choice of law and preemption analysis is used, not only to resolve conflicts, but to determine what one should read in order to find authority.
 
 
 12
 Displacement of state law by federal common law applies only in "few and restricted" areas. O'Melveny & Myers v. FDIC, 512 U.S. 79, 87, 114 S.Ct. 2048, 2054-55, 129 L.Ed.2d 67 (1994). The Supreme Court has identified those areas as those involving a clear statutory directive to preempt state law, or a direct conflict between state and federal law, or "uniquely federal interests." Boyle v. United Technologies Corp., 487 U.S. 500, 504, 108 S.Ct. 2510, 2514, 101 L.Ed.2d 442 (1988).
 
 
 13
 The federal interest is unaffected by conflicting claims by the surety and the lender to a progress payment already made. See Martin v. National Surety Co., 300 U.S. 588, 595, 57 S.Ct. 531, 534, 81 L.Ed. 822 (1937). There is no preemption, no federal statutory directive preempting state law, and no direct conflict between federal and state law. State courts resolve such disputes far more frequently than federal courts, so state law is better developed. There is no great interest in national uniformity. Application of state law, producing uniformity within a state, makes it easier for small local firms to use the same practices and the same inexpensive forms on all their projects, and for those involved in the industry to use routine practices that can be administered by personnel untrained in the law. If legislative reforms are needed, state government is more accessible to the various interests. In disputes between lenders and sureties over payments already made by the federal government, state law rather than federal law is the proper source of authority.
 
 
 14
 II. Theories of recovery.
 
 
 15
 A. Conversion.
 
 
 16
 The bank argues that it could not be guilty of conversion of the surety's money, the theory on which it lost the case in district court, and we agree. "A conversion is the act of willfully interfering with any chattel, without lawful justification, whereby any person entitled thereto is deprived of the possession of it." Public Utility District v. Washington Public Power Supply System, 104 Wash.2d 353, 705 P.2d 1195, 1211 (1985) (en banc).
 
 
 17
 It is doubtful whether the money in the bank account was a chattel that could be the subject of a conversion. It is of course a mere metaphor to speak of "the money in the bank account." In fact, the bank received a wire transfer from the government, and entered a notation in its books acknowledging a debt from itself to the contractor for the amount of the transfer. The "money in the bank account" was nothing but an acknowledgment of indebtedness from the bank to its depositor. Allied Sheet Metal Fabricators, Inc. v. Peoples Nat. Bank, 10 Wash.App. 530, 518 P.2d 734, 738-39 (1974). Though money or a check could in some circumstances be the subject of conversion, Public Utility District, 705 P.2d at 1211, for example if someone wrongfully took a check from another's desk, the tort traditionally involves wrongful taking and carrying away of something tangible. Henry Winthrop Ballantine, Shipman on Common Law Pleading 107-113 (1923). Except for special kinds of accounts in some jurisdictions, bank accounts generally cannot be the subject of conversion, because they are not specific money, but only an acknowledgment by the bank of a debt to its depositor. See generally Annot., Nature of Property or Rights Other Than Tangible Chattels Which May Be the Subject of Conversion, 44 A.L.R.2d 927 (1955).
 
 
 18
 Even where money can be the subject of conversion, the cause of action does not lie "unless it was wrongfully received by the party charged with conversion, or unless such party was under obligation to return the specific money to the party claiming it." Public Utility District, 705 P.2d at 1211. The bank did not wrongfully receive the money; it was duly credited by the government to the bank pursuant to an approved assignment. Nor did the bank, when it received the money, June 19, have any obligation to deliver it to another. Knowledge of a lien against money does not make the recipient liable for conversion. Davin v. Dowling, 146 Wash. 137, 262 P. 123, 124 (1927).
 
 
 19
 B. Subrogation.
 
 
 20
 The surety argues that it was subrogated to the contractor's right to recover progress payments from the time the contractor defaulted, and that the contractor defaulted when it failed to pay subcontractors on time.
 
 
 21
 As of the time the bank received the money, and as of the time the bank setoff the progress payment against its loan to the contractor, the surety had not yet paid any subcontractors. Subrogation would mean that, having paid them, the surety would step into their shoes and take over their rights to recover the money they had been entitled to. But because the surety had not yet paid them, the unpaid subcontractors still owned the rights to payment. At common law, a surety does not become subrogated to its principal's right to payment from a third party until the surety performs the principal's obligation. Restatement (Third) of Suretyship & Guaranty § 27 (1995); Restatement of Security § 141 (1941); 73 Am.Jur.2d Subrogation § 26 (1974). Thus the surety in this case had not been subrogated to the contractor's right to the government progress payment. While we have found no Washington case on all fours, there is no reason to doubt that Washington applies the usual rule. See Johnny's Seafood Co. v. City of Tacoma, 73 Wash.App. 415, 869 P.2d 1097, 1101 (1994) (subrogation allows insurer to recover what it "has paid" its insured); Jones v. Firemen's Relief & Pension Board, 48 Wash.App. 262, 738 P.2d 1068, 1071 (1987) (insurer is not entitled to subrogation until the insured has been fully compensated for his injuries).
 
 
 22
 The surety argues that it became subrogated to the contractor's right against the government, but that would not matter, because it is not making a claim against the government. The government had already paid out the money when the dispute arose. Nor could the surety's subrogation to the rights of the government to apply unpaid progress payments to the cost of completion, see National Shawmut Bank v. New Amsterdam Cas. Co., 411 F.2d 843, 848 (1st Cir.1969), matter, because the money was disbursed. Once the government has paid the contract proceeds to the bank, its interest in the proceeds and its right to have them applied to pay laborers and materialmen ceases to exist, so there is no longer a government right to which the surety can be subrogated. Bank of Arizona v. National Surety Corp., 237 F.2d 90 (9th Cir.1956).
 
 
 23
 C. Priority.
 
 
 24
 All of the surety's authorities are distinguishable, and therefore unhelpful for resolving a dispute between the surety and the bank after the funds have been paid to the lender. Reliance Ins. Co. v. United States, 15 Cl.Ct. 62 (1988), for example, deals with entitlement to funds still held by the government. In re Massart Co., 105 B.R. 610 (W.D.Wash.1989), is a claim by the surety against the contractor's bankruptcy estate, so it establishes a right against the defaulting contractor rather than against the lending bank. Likewise, in Pearlman v. Reliance Ins. Co., 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962), the surety that had already paid the laborers and materialmen was entitled to the money the government paid to the contractor's bankruptcy trustee. Pearlman too thus has to be classed with the cases where the surety is claiming against the contractor's successor rather than the bank.
 
 
 25
 The surety argues that the contractor's bank account was impressed with a constructive trust in its favor from the time the contractor first breached its contract by failing to make timely payments to subcontractors. It is hard to make sense of a trust theory, because the bank account is merely an acknowledgment of a debt from the bank to the contractor. This is not a case where the lender, in a dishonest transaction, collected money from the government with knowledge that the contractor had promised the surety to pay it into a fund for laborers and materialmen ahead of the lender. Cf. Martin v. National Surety Co., 300 U.S. 588, 593-94, 57 S.Ct. 531, 533-34, 81 L.Ed. 822 (1937). The bank received the wire transfer without any knowledge that would impose a trust on the funds at the time the bank received the transfer.
 
 
 26
 Each side argues equity, and each has a sensible argument based on equity. The bank knew that the contractor was in poor shape financially, and, though it did not know that subcontractors were not getting paid, it could have assured that they were by policing the loan more effectively. On the other hand, the surety knew that subcontractors were not getting paid, and could have disclosed the problem to the bank and caused the bank to police payments to the subcontractors. For that matter, the surety could have disclosed the problem to the government and arranged to have the subcontractors paid directly. The bank and the surety both contributed in essential ways to the project. Both had reasonable grounds for the procedures they used, and as a practical matter, disclosure may have been reasonably delayed out of concern that it would shut down the project and precipitate a failure that did not need to happen. Comparison of equities leads nowhere. Of course there is no authority for the attractive notion of splitting this loss between these two innocent victims.
 
 
 27
 The surety argues that the bank lost its setoff right once the surety asserted its claim, so the bank setoff came too late, citing Peoples National Bank v. United States, 777 F.2d 459 (9th Cir.1985). In that case, we held that where the IRS levied on the bank account, the bank's as yet unexercised right of setoff could not defeat the tax lien. That case is distinguishable because it involved a levy. A levy is a seizure, not merely a claim. The authority more in point is Allied Sheet Metal Fabricators, Inc. v. Peoples National Bank, 10 Wash.App. 530, 518 P.2d 734 (1974), which held that the bank could apply its depositor's checking account balance to the depositor's note to the bank instead of paying outstanding checks with the money in the account. The Washington court held that that was an application of the general rule that the bank could setoff its indebtedness to the depositor against the depositor's debt to the bank. Id. 518 P.2d at 739.
 
 
 28
 What we need, in order to resolve this case, is authority for how to resolve conflicting claims of the surety and the lender, when the lender, without fraud, has received the progress payment from the government. The authorities, in cases where the money has been paid to the bank by the government, favor the bank against the surety. California Bank v. United States Fid. & Guar. Co., 129 F.2d 751, 755 (9th Cir.1942), holds that when the bank receives the money from the government without notice or knowledge that it is part of a fund in which the surety has or may thereafter acquire a superior right, the surety is not entitled to recover the money from the bank. See also Bank of Arizona v. National Surety Corp., 237 F.2d 90 (9th Cir.1956). Dicta from the First Circuit says "had the Bank received payment, it could not (absent circumstances amounting to fraud) have been divested by the surety." National Shawmut Bank v. New Amsterdam Cas. Co., 411 F.2d 843, 848 (1st Cir.1969). The phrase "circumstances amounting to fraud" may be an allusion to the egregious facts in Martin v. National Surety Co., 300 U.S. 588, 57 S.Ct. 531, 81 L.Ed. 822 (1937). None of these cases is controlling, and the theories vary, but the outcome seems generally to be that where the bank and the surety contest entitlement to money that the government has disbursed to the bank, the bank prevails.
 
 
 29
 Professor Gilmore's great treatise likewise says that the cases generally hold that once the money has been paid over to the bank, the bank prevails against the surety:
 
 
 30
 It is possible to divide the recent cases according to whether the money which is being fought over has been paid over to the bank or remains in the hands of the obligor: The bank has regularly been allowed to keep what it has received, and the surety has regularly been given a prior claim to the retained percentages and progress payments earned put not disbursed.
 
 
 31
 Grant Gilmore, Security Interests In Personal Property, 978 (1965).
 
 
 32
 We agree with Professor Gilmore that the equities are strong, equally strong, for both sides, so little is to be gained by arguing which deserves the money more. Id. at 979. Both are more or less innocent victims. The legal theories that can be constructed for each are somewhat metaphysical and indeterminate. Though no controlling case is entirely on point, holding for the bank, where the money has been paid into the bank, is more consistent with what the parties would likely predict based on past cases. A predictable result has the advantage that the parties can make reasonable financial calculations based upon it, and contract for a different result if they find that more efficient. We therefore conclude that the bank was entitled to summary judgment.
 
 
 33
 REVERSED.